IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CONSTANCIA SIMPSON HAYES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 09-926-SLR |
| | ) | |
| DELAWARE STATE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Barbara H. Stratton, Esquire of Knepper & Stratton, Wilmington, Delaware.  Counsel for Plaintiff.

Robert A. Ranieri, Esquire of Salmon, Ricchezza, Singer & Turchi LLP, Wilmington, Delaware.  Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: July 29, 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Constancia Simpson Hayes ("plaintiff") instituted this employment discrimination action on December 3, 2009, following the Delaware Department of Labor ("DDOL") June 22, 2009 Final Determination and Right to Sue Notice to plaintiff (D.I. 16, ex. 3) and the September 14, 2009 United States Department of Justice, Civil Rights Division issuance of a notice to plaintiff of her right to institute a civil action. (*Id.,* ex. 2) Defendant moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on December 28, 2009. Thereafter, plaintiff filed an amended complaint on January 15, 2010. In her amended complaint, plaintiff claims that defendant is liable for sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 et seq. Plaintiff's amended complaint reflects removal of a claim for punitive damages, and addition of a claim for gender harassment and hostile work environment. (*Compare* D.I. 16 at ¶¶ 142-53 *with* D.I. 1 at ¶¶ 135-42) Defendant now moves to dismiss portions of plaintiff's amended complaint pursuant to 12(b)(6) on the basis that they are untimely. (D.I. 18 at 1, D.I. 19 at ¶¶ 1-4) The court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343.

## II. BACKGROUND

Plaintiff is an African-American woman and a citizen of New Castle County, Delaware. (D.I. 16 at ¶¶ 4, 9) Defendant Delaware State University ("DSU") is a land-grant college and public university whose main campus is located in Dover, Delaware. (*Id.* at ¶ 5) Defendant has, at all relevant times, been an employer as defined in § 701(b)(g)(h) of the Civil Rights Act, 42 U.S.C. § 2000(b)(g)(h). (*Id.* at ¶ 6) Defendant is

a National Collegiate Athletic Association ("NCAA") Division I school and, as such, is required to have an equitably-compensated Senior Woman Administrator ("SWA") in its Athletics Department.  (*Id.* at ¶¶ 7-8)

On July 1, 2001, pursuant to a one-year contract, plaintiff began employment with defendant as Head Women's Track Coach and SWA.  (D.I. 16 at ¶ 9)  At the end of this contract, plaintiff and defendant entered a three-year contract due to expire on June 30, 2005.  (*Id.* at ¶ 10)  During that time period, plaintiff was well-regarded in both positions, receiving endorsements from her superiors, including DSU president, Dr. Allen Sessoms ("Sessoms"), for participation in a leadership training program ("the Leadership Institute") for which she was subsequently selected.  (*Id.* at ¶¶ 11-18) Additionally, plaintiff was actively involved as an administrator, serving on and chairing various committees, and supervising one staff member and fourteen sports.  (*Id.* at ¶ 20)

As plaintiff's contract neared expiration in spring 2005, plaintiff anticipated that defendant would renew it and offer her a long-term contract.  (*Id.* at ¶ 19)  Although defendant's employee handbook required that employees receive thirty-days written notice if their contract was not to be renewed, plaintiff never received such notice.  (*Id.* at ¶ 21)  When, by mid-June, plaintiff still had not received a new contract, she inquired with Sessoms and DSU Vice President and Head of Human Resources, Mark Farley ("Farley") as to its whereabouts.  (*Id.* at ¶¶ 22-23)  While Sessoms directed plaintiff to Farley, Farley indicated that the contract would not be prepared until the school hired a new Athletics Director; however, Sessoms told plaintiff that this was not the case.  (*Id.*

2

at ¶ 24)

Despite requesting a new, five-year contract, increased compensation, and a full-time Assistant Coach on June 17, a week later plaintiff left for the Leadership Institute without having a contract. (*Id.* at ¶¶ 25-26) While plaintiff was away, defendant hired a new Athletic Director, Chuck Bell ("Bell"), with a three-year contract.[1] (*Id.* at ¶ 27) At a meeting with plaintiff in July 2005, Bell indicated that he would authorize a pay raise (making plaintiff's pay more compatible with the males in the department), and advised her that he wanted her to stop coaching and become a full time administrator, but did not provide her with a contract. (*Id.* at 29-30) Shortly thereafter, around July 27, 2005, defendant announced that plaintiff was promoted to Associate Athletics Director, and would continue as Head Track Coach until the end of the 2005-2006 academic year, but would a full time administrator after that. (*Id.* at ¶ 31)

Without having yet provided plaintiff with a contract, in late July or early August 2005, defendant hired a male Senior Associate Athletics Director, Dr. Ricardo Hooper ("Hooper"), and a male Associate Athletics Director, Patrick O'Brien Hairston ("Hairston"), pursuant to contracts. (*Id.* at ¶¶ 32-34) Subsequently, Bell and Hooper either removed or demoted other senior female administrative staff in the department replacing them with males.[2] (*Id.* at ¶¶ 32, 35-39) Although defendant's Gender Equity

_____

[1]At that point, there were three senior women administrative staff in the Athletics Department: plaintiff; Jane Hicks ("Hicks"), Director of Academic Services and the National Sports Youth Program; and Kimberly Walker ("Walker"), Associate Athletics Director of Compliance. (D.I. 16 at ¶ 28)

[2]Hicks was fired from her $50,000 per year director position and later re-hired as an administrative assistant, at a salary of $22,000 annually. (D.I. 16 at ¶ 35) Similarly, Walker's associate directorship was taken away, her contract changed to day-to-day,

Plan requires an assistant to the SWA, Bell eliminated this position. (*Id.* at 40) In addition, Bell and Hooper (both plaintiff's supervisors) removed job responsibilities from plaintiff, giving supervision of women's sports to male administrators, and telling plaintiff she would no longer be working with men's sports. (*Id.* at ¶¶ 41-43)

By September 2005, plaintiff had received a pay raise, but still no contract. (*Id.* at ¶ 44) After Walker's firing in October 2005, plaintiff, without having ever received an answer about her contract, stopped asking for a contract, because she did not want to be the next woman forced out. (*Id.* at ¶ 45) At this point, plaintiff was the only senior female staff administrator in defendant's Athletics Department. (*Id.* at ¶ 46) Plaintiff claims that she realized, by fall of 2005, that Hooper did not treat women and men the same way, stating that he acted abusively towards plaintiff and other women, and at one point responded in a hostile manner when plaintiff would not fire another female employee who had been on the job for approximately three years. (*Id.* at ¶¶ 47-53, 56) Additionally, in November 2005, Hooper instituted a change in defendant's vehicle policy, which only affected plaintiff's sport, Women's Track and Field, but was hostile towards plaintiff when confronted about the change. (*Id.* at ¶¶ 54-55)

In November 2005, while Bell was away, plaintiff called him to complain about Hooper and ask for his help, explaining that Hooper tried to intimidate her because she was a woman. (*Id.* at ¶¶ 57, 59) Bell's response was to advise plaintiff that Hooper

---

and her salary reduced by $25,000; she was later fired. (*Id.* at ¶ 36, 39) Her responsibilities were given to a new male administrator. (*Id.* at ¶ 37) When, at one point, Bell asked plaintiff what Walker's title had been, he confided that he needed to know because in order not to be sued for sex discrimination, he would have to call the job something else, although the job duties were the same. (*Id.* at ¶ 38)

was a "hot head" and that plaintiff should try to "help him learn to deal with people." (*Id.* at ¶ 59)  Hooper apologized, but his contrition was short-lived and plaintiff kept her distance from him, despite their offices being in close proximity. (*Id.* at 60-61)

Plaintiff claims that, while she was in Florida at a track and field convention at the beginning of December 2005, she received harassing phone calls and e-mails from Hooper regarding hiring a Strength and Conditioning Coach, and that he falsely accused her of not submitting documents to Human Resources. (*Id.* at ¶ 62)  On approximately December 15, 2005, plaintiff initiated a conversation with Hooper in which she explained that they needed to work together for the benefit of defendant and its students. (*Id.* at ¶ 63)  Hooper's response was to inform plaintiff that he could have her fired and could easily start the process. (*Id.*)  Following this conversation, plaintiff complained to Bell about Hooper's hostility, told Bell about Hooper's threat to fire her, and explained that she could no longer stand his abuse. (*Id.* at ¶ 64)  Bell's response was that plaintiff would have to live with Hooper's behavior as he was to become the next Athletics Director. (*Id.* at ¶ 66)  At this point, plaintiff contacted a friend at another university, who urged her to keep her job. (*Id.* at ¶ 67)

Following the Christmas break, plaintiff returned to work in January 2006 and made attempts to avoid Hooper as much as possible. (*Id.* at ¶ 68)  However, Hooper's harassment continued. (*Id.*)  On approximately February 20, 2006, Bell instructed plaintiff to write a job description for the track coach position she would no longer fill after the academic year ended. (*Id.* at ¶ 70)  Plaintiff completed this task within the week, but in the process angered Hooper, who was upset that she did not ask for his

help. (*Id.*) Plaintiff was scheduled to attend a basketball game in Daytona Beach in February 2006; she learned on February 21, 2006 that Hooper had removed her from the travel itinerary. (*Id.* at ¶ 71)  The following day, plaintiff clarified with Bell the procedure for attending an away game, and was told that she simply needed to put herself on the itinerary. (*Id.* at ¶¶ 72-73)  When plaintiff explained that Hooper had taken her off the itinerary, he denied having done so.  The department's administrative assistant, Graves, corroborated plaintiff's story. (*Id.* at ¶ 73)

On March 2, 2006, plaintiff was called to a meeting with Bell (with Graves in attendance), who questioned her demeanor and informed her that she appeared to be "unhappy and angry." (*Id.* at ¶ 74)  Bell informed plaintiff that he would put his comments in writing and give them to her at a later date, which he did in a memo dated March 20, 2006.[3] (*Id.* at ¶¶ 74, 89)  Plaintiff believes that Bell had never chastised a male employee for such demeanor. (*Id.* at ¶ 90)  On March 6, plaintiff was scheduled to attend a conference sponsored by the Mid-Eastern Athletic Conference ("MEAC"), which plaintiff was required to attend as Chair of the Senior Woman Administrator's Association. (*Id.* at ¶ 75)  Before leaving, plaintiff approached both Bell and Hooper, who was unresponsive, asking how they could work together. (*Id.*)  Plaintiff then sent an e-mail to University President Sessoms, asking to meet with him during the MEAC conference in Raleigh, North Carolina. (*Id.* at ¶ 76)

On March 10, 2006, plaintiff and Sessoms met in Raleigh, where plaintiff

---

[3]This memo stated, "your demeanor, facial expressions, body language, and verbal language has been angry, negative and disruptive for three months or more. By your own admission, you have been angry with Ricardo Hooper." (D.I. 16 at ¶ 89)

complained about Hooper's abusive and harassing behavior towards her and his threats to fire her, stating that she believed Hooper's treatment was because she was female and that he did not treat male coaches and administrators in the same way. (*Id.* at ¶¶ 77-79) Sessoms reassured plaintiff that Hooper could not fire her, that she was not the problem, and that he would investigate and handle the matter. (*Id.* at ¶ 81) Plaintiff later learned that Bell was outraged about the meeting. (*Id.* at ¶ 82)

Soon after the meeting with Sessoms, Hooper insisted that the Head Trainer, Aliglo, a woman, could no longer work with male athletes, and demoted her to Assistant Trainer, replacing her with a male. (*Id.* at ¶¶ 83, 86) When plaintiff opposed the treatment of Aliglo and accused Hooper of sex discrimination, Hooper was unresponsive. (*Id.* at ¶ 84) Also following the March 10th meeting with Sessoms, Hooper's harassment of plaintiff escalated. (*Id.* at ¶ 87)

On March 20, 2006, Hooper e-mailed plaintiff accusing her of not properly consulting him about the itinerary for track and field, or completing a job description for the Head Track Coach position, although she had already done so. (*Id.* at ¶ 88) On March 22, 2006, Hooper accused plaintiff of not following standard procedures when she requested that defendant release two student athletes and did not inform Hooper of an academic waiver request.[4] (*Id.* at ¶ 91) Plaintiff refuted these allegations, explaining to Bell that she had not requested releases for the two athletes, and that the waiver request for a special needs student was ongoing prior to Hooper's arrival. (*Id.* at ¶ 92)

---

[4]This portion of plaintiff's amended complaint differs from plaintiff's original complaint, which states that the event set forth in this paragraph occurred on March 20, 2006. (D.I. 1 at ¶¶ 88-90)

7

Bell later spoke with Hooper, who then sent plaintiff an e-mail acknowledging that he had made incorrect statements and admitting that plaintiff was not aware of the release request. (*Id.* at ¶ 93)  Later that day, Bell issued the following directive to senior staff:

> [Plaintiff] reports directly to me as Associate Athletic Director and Senior Women's Associate Athletic Director and Senior Women's Administrator and for ease of communication, effective today, will report to me as Head Women's Track Coach, until she vacates that position on the last day of the track competition in spring.  When [plaintiff] begins her duties as a full time administrator we will review and assess our sport and area supervisor structure and make changes for efficiency of operations.

(*Id.* at ¶ 94)  Despite this, plaintiff still had to work with Hooper because he was the head of the unit and oversaw daily operations. (*Id.* at ¶ 95)  Additionally, Bell's directive did not prevent Hooper from making abusive and intimidating comments to plaintiff, telling her that he could start the process to get her fired, and continuing to criticize the manner in which plaintiff completed work assignments. (*Id.* at 96)

In response to the memo Bell sent on March 20 regarding her demeanor, on approximately April 16, 2006, plaintiff wrote a letter to Farley complaining of Hooper's "abusive, hostile and harassing behavior," providing a detailed chronology of events and requesting "respect and a less hostile work environment." (*Id.* at ¶ 97-98)  Plaintiff provided a copy of this letter to Sessoms. (*Id.* at ¶ 100)  Approximately three days later, Fred Reynolds, defendant's Director of Compliance, e-mailed plaintiff a memo questioning whether she had granted a release from DSU to a student athlete. (*Id.* at ¶ 101)  Plaintiff responded, refuting the allegations. (*Id.* at ¶ 102)

Finding herself under extreme stress, plaintiff visited her family doctor, after which she advised Sessoms that her blood pressure was high. (*Id.* at ¶ 103)  Sessoms'

8

response, on approximately April 19, 2006, was to e-mail plaintiff advising her to keep her blood pressure under control by doing "stress transfer and not internaliz[ing] so much," noting that this situation had more to do with Hooper than her. (*Id.* at ¶ 104) Shortly thereafter, on April 24, 2006, plaintiff took four days of medical leave from work due to her stress and high blood pressure. (*Id.* at ¶ 105)

While plaintiff was on medical leave, on April 26, 2006, she e-mailed Sessoms to advise him that she was seeking clarification from Farley as to whether Bell's "demeanor" memo was a letter of reprimand or some other sort of disciplinary warning. (*Id.* at ¶ 106) On or about the same date, Bell sent a memo to Farley recommending that plaintiff be placed on administrative leave for allegedly pushing a student athlete to transfer to another university; plaintiff avers that he knew or should have known that this allegation was false. (*Id.* at ¶ 107-08)

On or about April 27, 2006, plaintiff went to her office to complete paperwork before accompanying her track team to the Penn Relays, but was told to go to Human Resources upon arriving at work. (*Id.* at ¶ 109) At that point, Farley informed plaintiff that she was being placed on administrative leave due to the allegation that she had coerced a student athlete and committed an NCAA violation. (*Id.* at ¶ 110) Plaintiff again refuted these allegations, and suggested to Farley that he check protocol with other universities. (*Id.* at ¶ 111) Farley eventually confirmed that plaintiff was correct and allowed her to attend the Penn Relays with her team. (*Id.* at ¶ 112)

Plaintiff attended another track meet in North Carolina after the Penn Relays. (*Id.* at ¶ 113) Upon returning on May 8, 2006, Bell called her into his office to tell her he

9

was firing her for "nothing in particular." (*Id.* at ¶¶ 113-15) At that meeting, Bell told plaintiff not to tell anyone, and gave her a Post-it note on which he wrote "3 months pay and benefits May 15-Aug. 15–plus other earned days per DSU policy." (*Id.* at ¶ 116) Bell did not give any written notice of non-renewal or any formal termination letter. (*Id.*) Bell instructed plaintiff to finish evaluations of her supervisees, and told her she could continue using her office to search for another job. (*Id.* at ¶ 117) Plaintiff contacted Sessoms and Farley, and Sessoms informed her that he would handle it. (*Id.* at ¶ 118) Plaintiff also contacted the Equal Employment Opportunity Commission ("EEOC"), which advised her that because she had not received a formal termination letter, she should continue going to work. (*Id.* at ¶ 119)

On approximately May 10, 2006, Bell e-mailed plaintiff stating that defendant would authorize no further travel and that plaintiff was not to represent defendant at any meeting or function after May 14, 2006. (*Id.* at ¶ 120) Plaintiff's last day in the office was May 15, 2006. (*Id.* at ¶ 121) On or about May 16, 2006, plaintiff e-mailed Bell, informing him that she would be out of the office that day because of illness. (*Id.* at ¶ 122) Bell responded that, as he had previously stated, plaintiff was on paid administrative leave from May 15 through August 15 and "not required to perform any DSU work duties nor come to campus."[5] (*Id.*) When plaintiff contacted Farley, he advised her that she could travel to and complete the Leadership Institute, but the remainder of her work "would be as indicated in [Bell's] e-mail." (*Id.* at ¶¶ 123-24) As a

_____

[5]Plaintiff in fact remained on the regular payroll until the end of September 2006. (D.I. 16 at ¶ 134)

10

result, plaintiff could no longer coach the women's track team for the rest of the season, nor attend various other meetings and tournaments, despite the fact that the allegation that she had pressured a student athlete to transfer was false.[6]  (*Id.* at ¶¶ 125, 127) Prior to the last Leadership Institute meeting in June 2006, Hooper informed the NCAA that plaintiff was no longer associated with defendant and could not represent defendant at the Institute.  (*Id.* at ¶ 128)  Plaintiff contacted Sessoms and Farley based on Farley's previous assurance that she could attend the Leadership Institute.  (*Id.* at ¶ 129)  Because of Hooper's contact with the NCAA, at the Leadership Institute's graduation in June 2006, plaintiff was not listed as an affiliate of any university, nor were her credentials displayed as they were for other graduates.  (*Id.* at ¶ 130)  This caused plaintiff embarrassment and humiliation and eliminated her from recruitment efforts by other schools for senior athletic administrative positions.  (*Id.*)

Plaintiff attempted to institute the grievance process, but defendant was unresponsive.  (*Id.* at ¶ 131)  At no time did plaintiff ever receive notice of non-renewal of her contract, or an offer of substantially equivalent alternative employment.[7]  (*Id.* at ¶¶ 133, 135)  Since her termination from defendant, plaintiff has suffered severe economic consequences; continues to have lost wages and benefits, which will

---

[6]Plaintiff states that two male football coaches did not suffer the same punishment, and were permitted to continue coaching for the remainder of the 2005 season, even after DSU accused them of misappropriating funds.  (D.I. 16 at ¶ 126)

[7]During a meeting in September 2006 at which plaintiff returned her DSU property, Farley alleged that Bell had given plaintiff a written notice of non-renewal on May 16, 2006; however, plaintiff was not at work on that date and never received such notice.  (D.I. 16 at ¶¶ 132-33)

11

continue for an indefinite time; has suffered embarrassment, humiliation, extreme emotional distress, and anxiety; and suffered damage to her reputation.  (*Id.* at ¶ 136)

## III. STANDARD OF REVIEW

In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff.  *See Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002).  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007) (interpreting Fed. R. Civ. P. 8(a)) (internal quotations omitted).  A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* at 555 (alteration in original) (citation omitted).  The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."  *Id.* (citations omitted).

## IV. DISCUSSION

Plaintiff asserts three counts against defendant, all in violation of Title VII, 42 U.S.C. §§ 2000(e) et seq.  First, plaintiff asserts a claim of sex discrimination based on her termination from employment, defendant's prevention of plaintiff from attending various tournaments and meetings, defendant's refusal to allow plaintiff to continue

coaching the women's track team for spring 2006, not providing plaintiff with a contract, and making false accusations against plaintiff. (D.I. 16 at ¶¶ 142-45) Plaintiff also asserts claims of gender harassment and a hostile work environment. (Id. at ¶¶ 146-49) Lastly, plaintiff brings a claim of retaliation on the basis that defendant terminated plaintiff's employment, did not permit her to coach the women's track team for part of the 2006 season, prohibited her from attending various tournaments and meetings, did not provide a contract, made false accusations against her, and contacted the Leadership Institute. (Id. at ¶¶ 150-53)

At issue on the present motion is the appropriate date to apply for tolling the statute of limitations, and whether plaintiff's complained-of acts are part of an ongoing violation or constitute discrete discriminatory acts. Defendant argues that many of the allegations complained of are time-barred because the acts are discrete and occurred more than 300 days before filing of the charge, which defendant argues occurred January 17, 2007.[8] (D.I. 19 at 3) In response, plaintiff asserts that the filing date of the charge is December 4, 2006, or the date plaintiff filed her intake questionnaire with DDOL.[9] (D.I. 22 at 21) Plaintiff also asserts that most of the actions are non-discrete insofar as they are actually part of her hostile work environment claim. (Id. at 24-27) Plaintiff claims that, although the non-receipt of an employment contract is a discrete act, it is timely because defendant never communicated to plaintiff a final decision on this matter until the date of her termination. (Id. at 31)

---

[8]In that case, the cut off date for discrete acts is March 23, 2006.

[9]If the court finds that the DDOL questionnaire does constitute a charge, the 300-day window extends to February 7, 2006.

13

Based on the forgoing, resolution of the motion at bar requires a determination, first, of whether plaintiff's DDOL questionnaire of December 4, 2006, or the EEOC filing of January 17, 2007, constitutes a charge for the purposes of calculating the applicable statute of limitations, and second, a determination of which acts are discrete acts to which the statute of limitations applies.

## A. Statute of Limitations

Under Title VII, plaintiff must file a charge within 180 days of the complained-of conduct. 42 U.S.C. § 2000e-5(e)(1). In states that have an entity with the authority to grant or seek relief regarding an alleged unlawful practice (so-called "deferral states"), a plaintiff who files a grievance with that agency has 300 days from the time of the employment practice to file the charge with the EEOC. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). Delaware is such a state. *See Maynard v. Goodwill Indus. of Del. and Del. County, Inc.*, 678 F. Supp. 2d 243, 250 (D. Del. 2010) (citing 42 U.S.C. § 2000e-5(e)).

As noted previously, on December 4, 2006, plaintiff visited the DDOL to file a charge of discrimination.[10] (D.I. 16 at ¶ 137) While there, she completed an intake questionnaire and met with a DDOL investigator. (*Id.*) DDOL required plaintiff to return on January 17, 2007 to verify her charge.[11] (*Id.*) DDOL issued a final determination on June 22, 2009, concluding that "there is reasonable cause to believe that an unlawful

---

[10]This charge of discrimination is a joint charge between DDOL and the EEOC. (D.I. 16 at ¶ 138)

[11]This section of plaintiff's amended complaint represents an addition from her original complaint, which merely stated that she filed charges with DDOL and the EEOC on January 17, 2007. (D.I. 1 at ¶ 131)

14

employment practice has occurred." (*Id.* at ¶ 139; *see also* D.I. 16, ex. 2)  Plaintiff argues that the January 17, 2007 verified charge of discrimination relates back to her December 4, 2006 DDOL intake questionnaire for purposes of tolling the statute of limitations.[12]  (D.I. 22 at 21)  Defendant, on the other hand, argues that the DDOL questionnaire is not a charge of discrimination and the proper filing date of the charge is January 17, 2007.[13]  (D.I. 19 at 12)

The Supreme Court has stated that, for a filing to be construed as a charge, it must contain, at a minimum, an allegation and the name of the charged party and reasonably be construed as a request to take action. *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008).  While an intake questionnaire is not *per se* sufficient to constitute a charge, a court may treat it as a charge if it meets the above requirements. *See id.* at 401, 405.  However, simply filing an intake questionnaire does not give rise to an inference that an employee is requesting action. *See id.* at 405.  In *Holowecki*, the Supreme Court found respondent's filing of an intake questionnaire sufficient to constitute a charge because it contained more detailed information than the minimum required by 29 C.F.R. § 1626.8(b)[14] and also included an affidavit with a

---

[12]Verification is necessary to "insure against catchpenny claims of disgruntled, but not necessarily aggrieved, employees." *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 115 (2002).  A verification may relate back to the initial filing, to ensure that complainant does not unknowingly forfeit his rights. *See id.*  The EEOC requires no response from an employer until verification of the charge. *See id.*

[13]If plaintiff's DDOL intake questionnaire constitutes a charge, the applicable cut off date for claims that the court may consider is February 7, 2006.  If not, the time bar applies to all claims before March 23, 2006.

[14]This regulation provides that a charge should contain:  (1) the names and contact information for the person making the charge and the charged entity; (2) a

request to "[p]lease force Federal Express to end their age discrimination plan[.]" *Id.* at 404-05.

Before *Holowecki*, the Third Circuit had enunciated that an intake questionnaire is not sufficient to constitute a charge. *See Bailey v. United Airlines*, 279 F.3d 194, 199 n.2 (3d Cir. 2002); *see also Phillips v. DaimlerChrysler Corp.*, Civ. No. 01-247, 2003 WL 22939481, at *2 (D. Del. Mar. 27, 2003) (finding that, because an intake questionnaire serves a different purpose than a charge, plaintiff's DDOL questionnaire does not constitute a charge). The question now arises whether *Holowecki* alters that finding with respect to a Title VII claim.[15] While this court has not considered the issue, others in this Circuit have. The United States District Court for the District of New Jersey has found the use of an intake questionnaire as a charge sufficient and stated that later verification would relate back to the date of the intake questionnaire. *See Wood v. Kaplan Props.*, Civ. No. 09-1941, 2009 WL 3230267, at * 4 (D.N.J. Sept. 29, 2009) (unpublished opinion). In *Wood*, unlike the case at bar, the questionnaire had language stating that it could be taken as a charge. Specifically, the form stated that "[w]hen this form constitutes the only . . . written statement of allegations of employment

---

statement of facts describing the alleged discriminatory act; (3) the number of employees of the charged employer; and (4) a statement as to whether or not the charging party has initiated state proceedings. Nevertheless, a charge is sufficient where it is in writing and contains both the name of the prospective respondent and a general allegation as to the discriminatory act. *See Holowecki*, 552 U.S. at 396.

[15]It is important to note that *Holowecki* arose under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-64, whereas the current case is under Title VII, which has a stricter standard for filing a charge. *See Martin v. Pa. Dep't of Corr.*, Civ. No. 2:07-cv-0587, 2008 WL 4279761, at *5 (W.D. Pa. Sept. 12, 2008).

discrimination, the Commission will . . . consider it to be a sufficient charge of discrimination under the relevant statute(s)." *See id.* at *4 n.2.

The United States District Court for the Eastern District of Pennsylvania has found that an intake questionnaire containing the same language as that in *Wood* constituted a charge where it contained the only written statement of allegations of employment discrimination and also tracked language for Title VII claims. *See Joseph v. Pennsylvania*, Civ. No. 06-4916, 2009 WL 1012464, at *1 (E.D. Pa. Apr. 15, 2009). Because the language on the form was clear as to the definition of a charge, the court found that it need not comply with the *Holowecki* requirement that it contain a specific request for action. *See id.*

In another case in this Circuit addressing what can constitute a charge, the United States District Court for the Western District of Pennsylvania found that an attorney's letter to the EEOC could constitute a charge because it met the *Holowecki* requirements. *See Steiner v. Prof'l Servs. Indus., Inc.*, Civ. No. 09-723, 2009 WL 2950755, at *2 (W.D. Pa. Sept. 9, 2009). The *Steiner* court noted that the letter clearly constituted a request for remedial action. *See id.* The letter at issue in *Steiner* explicitly stated, "[c]onsider this [Steiner's] signed and dated charge. . . . Prepare your charge document and contact my client directly to expedite processing." *Id.* at *1.

The same court also found that where the only form filed was an intake questionnaire, but not a formal charge, the court might consider it a request for action. *See Rupert v. PPG Indus., Inc.*, Civ. No. 08-723, 2009 WL 596014, at *15 (W.D. Pa. Feb. 26, 2009). The *Rupert* court allowed plaintiff's intake questionnaire to count as a

17

charge because the EEOC activated its dispute resolution process in response. *Id.* at
*17. Additionally, the Director of the Pittsburgh EEOC filed a sworn affidavit stating that
the receipt of a general intake questionnaire would satisfy charging requirements and
indicate to the EEOC a clear intent on the part of plaintiff for the EEOC to act. *Id.* He
further stated that the EEOC deems the date receipt of an intake questionnaire as the
date of a charge. *Id.*

In contrast to the forms used in *Wood* and *Joseph*, plaintiff's questionnaire
specifically states that completion of the form does not constitute a charge. (D.I. 19 at
12; D.I. 23, ex. 1) Because the form lists the name of the charged party and contains
an allegation of discrimination,[16] it may be acceptable under *Holowecki*. (D.I. 23, ex. 1)
However, unlike *Steiner* and *Holowecki*, plaintiff's questionnaire does not contain any
specific request for action, and there is no evidence that plaintiff made any other
request for action in an accompanying affidavit or letter. (*Id.*)

Unlike in *Rupert*, it is unclear in the instant case whether the DDOL instituted its
dispute resolution process in response to plaintiff's questionnaire. As to the EEOC
proceedings, plaintiff simply states that on completion of the intake questionnaire, she
met with a DDOL investigator who required her to return on January 17, 2007 to verify
her charge. (D.I. 16 at ¶ 137) Even if the DDOL did immediately institute proceedings,
*Rupert* does not indicate that this, in itself, is sufficient to constitute a charge.[17] Indeed,

---

[16]Specifically, plaintiff's DDOL form states, "I believe this action was taken
against me because of my sex, age, race[, and] national origin." (D.I. 23, ex. 1)

[17]In fact, the DDOL did not issue a final determination finding "reasonable cause
to believe that an unlawful unemployment practice has occurred" until June 22, 2009.
(*Id.* at ¶ 138) This extended lapse in time makes it difficult to infer that proceedings

18

in *Rupert*, one of the three EEOC forms filed by plaintiffs had language noting that "[a]ll **charges** must state an issue which is what happened to you.  You must state what protected class you fall under which is the basis for discrimination." *Rupert*, 2009 WL 596014, at *17 (emphasis in original).  Here, plaintiff's form refers not to a charge, but to a "complaint." (D.I. 23, ex. 1)  Additionally, some of the *Rupert* plaintiffs indicated that they had already engaged assistance of counsel, which the court interpreted as an objective indicator that plaintiffs sought to activate EEOC proceedings, rather than simply obtain information. *Rupert*, 2009 WL 596014, at *17.

Plaintiff urges the court to adopt the approach taken in *Steiner*, in which plaintiff says the court found the date of the intake questionnaire controlling over the date of a later-signed charge of discrimination because the delay in official filing could be attributed to the agency, not plaintiff. (D.I. 22 at 22)  The court does not read *Steiner* to say that a charge should relate back to the intake questionnaire simply because the agency delayed filing.  Rather, the *Steiner* court found that the official charge related back to the letter sent by Steiner's attorney precisely because it met the *Holowecki* requirement that it be a request to take remedial action through the statement "[c]onsider this [Steiner's] signed and dated charge. . . . Prepare your charge document and contact my client directly to expedite processing." *Steiner*, 2009 WL 2950755, at *1-2.

In sum, plaintiff's intake questionnaire appears to satisfy the first two *Holowecki* requirements by calling for the name of the charged party and the asking for a brief

---

began at the filing of the intake questionnaire.

description of the complaint. However, the form refers only to filing a "complaint" (unlike *Rupert*), it specifically states that it "does **not** constitute the filing of a charge" (unlike *Wood* and *Joseph*), and plaintiff did not specifically request action (unlike *Holowecki* and *Steiner*). (D.I. 23, ex. 1) (emphasis added) Thus, even assuming (as we must on defendant's motion) that DDOL took action after plaintiff filed her intake questionnaire, it is deficient under *Holowecki* and cannot constitute a charge of discrimination. The appropriate charge date, therefore, is January 17, 2007, and the date before which discrete claims are time-barred is March 23, 2006.

## B. The Nature of the Violations

Defendant challenges certain of plaintiff's allegations as time-barred, specifically: (1) plaintiff's complaints about reduction in her work duties; (2) defendant's refusal to provide an employment contract; (3) elimination of plaintiff's assistant; (4) the "written and oral reprimand" from Bell (i.e., the "demeanor memo"); (5) the removal from travel itinerary; (6) not being permitted to coach her sport through the end of the 2006 season; (7) being prohibited from attending various meetings and tournaments; and (8) defendant's allegedly false accusations against her. (D.I. 19 at 7-8, 16, 19) Defendant asserts that these are discrete acts which, having occurred before March 23, 2006, are time barred. (*Id.*) In addition defendant appears to suggest that any act that occurred before March 23, 2006 is a discrete act that is time-barred. (*Id.* at 16-19)

Plaintiff contends that defendant reads her claims wrongly. Rather than asserting a number of discrete acts, many of the acts that defendant alleges are time-barred are components of her hostile work environment claim. (D.I. 22 at 16-18)

20

Plaintiff further contends that the acts provide background information and context for her retaliation and sex discrimination counts. (*Id.*) Plaintiff concedes that the non-provision of a contract is a discrete act, but contends that it is timely because it did not accrue until at least May 8, 2006. (*Id.*)

In a hostile work environment claim, so long as one act making up the hostile environment occurred within the applicable statutory period, the claim is timely. *See Morgan*, 536 U.S. at 118. This does not apply, however, if the acts complained of are discrete discriminatory or retaliatory acts. *See id.* at 122. The Supreme Court has enunciated several discrete acts: termination; failure to promote; denial of transfer; and refusal to hire. *Id.* at 114. In contrast, "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id.* at 116 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The Third Circuit's application of *Morgan* includes in the concept of discrete acts wrongful suspension, wrongful discipline, denial of training, and wrongful accusation. *See O'Connor v. Newark*, 440 F.3d 125, 127 (3d Cir. 2006). However, under *Morgan*, even where an act is time-barred, a plaintiff may still assert the existence of prior acts as background evidence supporting a timely-filed claim. *See Morgan*, 536 U.S. at 113.

Based on *Morgan* and *O'Connor*, only plaintiff's termination, the alleged wrongful accusations, and the failure to provide plaintiff with a contract are discrete acts which are subject to the time bar. In contrast, the reduction in plaintiff's duties, the elimination

21

of her assistant, and the removal from travel activities are not discrete acts, but make up part of plaintiff's hostile work environment claim.  With respect to the demeanor memo, if this is found to be a wrongful reprimand as defendant contends, it would be a time-barred discrete act under *O'Connor*.  (D.I. 19 at 19)  However, plaintiff contends that it is part of her hostile work environment claim.  (D.I. 22 at 18)  Looking at the facts in the light most favorable to the plaintiff, at this time it is impossible to determine whether this memo is a reprimand; therefore, the court cannot say that the memo is a discrete act subject to the time bar.

### 1. Hostile work environment

To determine the existence of a hostile work environment, the Third Circuit has enunciated a two-part test.  First, plaintiff "must demonstrate that at least one act occurred within the filing period . . . ." *West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995) (citing *United Airlines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)).  The *West* court noted that, when a sexual harassment claim is based on the existence of a hostile environment, it may straddle both sides of "an artificial statutory cut-off date" because such violations are continuing in nature.  *Id.* at 755 (citing *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 877 (D. Minn. 1993)).  In *West*, the trial court excluded much of the evidence predating the 300-day statutory period.  *See id.* at 756.  However, the Third Circuit noted that "[t]his strict application is not appropriate . . . where the existence of hostility and the employer's awareness of hostility can long predate the 300-day period." *Id.*  Because a hostile work environment claim is not a "sum of

discrete claims," the court must look at the totality of the circumstances of the work environment. *Id.* at 756.

As noted above, the court has found the cutoff date for claims to be March 23, 2006. Plaintiff meets part one of the test by alleging a number of non-discrete acts that occurred after the triggering of the time bar. For example, an e-mail from Sessoms on April 19, 2006 in response to plaintiff's email about her stress suggests the administration's tolerance of Hooper's behavior. (D.I. 16 at ¶¶ 103, 104) Additionally, despite being advised that plaintiff would begin to report directly to Bell on March 22, 2006 (one day before the start of the time bar), Hooper continued his abusive and intimidating behavior, threatening plaintiff that he could take steps to get her fired. (*Id.* at ¶¶ 94-96) Although not noted explicitly in plaintiff's amended complaint, it appears that this behavior continued into April 2006, based on a memo plaintiff submitted to human resources complaining of Hooper's "continuing intimidating, harassing, hostile and abusive behavior." (*Id.* at ¶ 97) Having established that at least one part of plaintiff's hostile work environment claim falls within the statute of limitations period, this claim is not time-barred.

Part two of the Third Circuit's test looks to whether the harassment is something "more than the occurrence of isolated or sporadic acts of intentional discrimination." *West*, 45 F.3d at 755 (citing *Jewett v. Int'l Tel. & Tel. Corp.*, 653 F.2d 89, 91 (3d Cir. 1981)). In *Morgan*, the hostile environment consisted of managers who "made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets." *Morgan*, 536

23

U.S. at 120.  While there is no allegation in the present case that managers made direct

comments about the capacity of women employees or made off-color jokes, plaintiff

sufficiently paints a picture of a pervasive atmosphere of "discriminatory intimidation"

towards women, particularly with respect to the firing and demotion of a number of

senior women administrators, the continual lessening of plaintiff's duties, and the

allegedly hostile and abusive attitude of Hooper.  (D.I. 16 at ¶¶ 28, 35-39, 41, 47-53)

*Morgan*, 536 U.S. at 116 (citing *Harris*, 510 U.S. at 21).  Additionally, plaintiff has

alleged that supervisors tolerated this atmosphere.  (D.I. 16 at ¶¶ 57-59, 64-66)  As the

court noted in *West*, "[a] hostile work environment is like a disease.  It can have many

symptoms, some of which change over time, but all of which stem from the same root."

*West*, 45 F.3d 756.  Here, as there, it appears "[t]he etiology in this case [may be] pure

gender bias."  *Id.*

## 2. Retaliation and sex discrimination

Title VII states, "it shall be an unlawful employment practice for an employer to

discriminate against any of his employees . . . because [the employee] has opposed

any practice made an unlawful practice by this subchapter."  42 U.S.C. § 2000e-3(a).

Retaliation exists where plaintiff engages in protected activity, after which the employer

takes adverse action that is causally connected to the protected activity.  *See Mitchell*,

556 F. Supp. 2d at 350 (citing *Berry v. Delaware*, Civ. No. 06-217, 2008 WL 906104, at

*3 (D. Del. April 1, 2008) (unpublished decision)).

Plaintiff alleges five instances of protected activity.  First, plaintiff alleges that on

November 4, 2005, she called Bell to ask for help "dealing with" Hooper's intimidating

24

behavior towards her because she was a woman. (D.I. 16 at ¶ 57)  Second, following

threats from Hooper, plaintiff again complained to Bell about Hooper's behavior. (*See*

*id.* at ¶ 64)  Third, on March 10, 2006, plaintiff met with Sessoms to complain that

Hooper treated her in an abusive and harassing manner, and did not treat male

administrators in the same way as women. (*Id.* at ¶¶ 76-81)  Plaintiff alleges that Bell

was outraged about the meeting. (*Id.* at ¶ 82)  Soon after this meeting, Hooper

determined that the head trainer, a female, could no longer work with male athletes.

(*Id.* at ¶ 83)  In the fourth instance of alleged protected activity, plaintiff told Hooper that

she believed this action against the head trainer was sex discrimination. (*Id.* at ¶ 84)

Lastly, on April 16, 2006 plaintiff wrote a letter to Farley about the March 20 "demeanor

memo" and to complain about Hooper's continuing intimidating, abusive, and hostile

behavior, and asking for "respect and a less hostile work environment." (*Id.* at ¶¶ 97-

99)  Plaintiff provided Sessoms with a copy of this letter. (*Id.* at ¶ 100)

    Plaintiff, in her complaint, alleges six separate actions that she claims are

retaliation for the above protected activity:  (1) her allegedly unlawful termination; (2)

defendant's prohibition on plaintiff's coaching of the women's track team for the balance

of the spring 2006 season; (3) defendant's prohibition of plaintiff's attendance at the

MEAC spring and summer meetings and the NCAA regional qualifying tournament; (4)

defendant's false accusations against plaintiff; (5) defendant's refusal to provide plaintiff

with an employment contract; and (6) defendant's contact with the Leadership Institute.

(D.I. 16 at ¶ 152)  Plaintiff also asserts numbers 1 through 5 of the above acts in her

sex discrimination claim.[18]  (*Id.* at ¶ 144)  The analysis, for the purposes of applying the statute of limitations to these acts, is the same for sex discrimination as retaliation.

### a. False accusations

With respect to plaintiff's claims of false accusation, plaintiff alleges that, following her March 10, 2006 meeting with Sessoms, Hooper's harassment increased and that, on March 20, he sent her e-mails with allegedly false accusations about her failure to follow proper procedure or complete a job description for her position. (*Id.* at ¶ 87-88)  On March 22, Hooper made another allegedly false accusation against plaintiff, asserting that she circumvented procedure by requesting the release of two student athletes and did not inform him of an academic waiver request. (*Id.* at ¶ 91-92)  Wrongful accusation is a discrete act under *O'Connor* and plaintiff's allegations in this respect before March 23, 2006 are time-barred. *See O'Connor*, 440 F.3d at 127.

On April 19, 2006, three days after plaintiff's letter to Farley about Bell's "demeanor memo," plaintiff received an e-mail questioning her about the granting of a release from defendant to a student athlete, accusations which plaintiff claims are false. (D.I. 16 at ¶¶ 101-02)  Plaintiff asserts that, following her April 16, 2006 letter to Farley, Bell, on about April 26, 2006, sent a memo to Farley recommending that plaintiff be placed on administrative leave for allegedly influencing a student athlete to transfer to

---

[18]Although plaintiff does not specifically state the following as part of her retaliation or sex discrimination claims, she also asserts that on December 15, 2005 Hooper threatened to fire her; and that on or about February 21, 2006, she learned that Hooper had removed her from the travel schedule for a basketball game that she was to attend in Daytona Beach, Florida. (*Id.* at ¶¶ 63, 71-73)  These acts appear to be in response to alleged protected activity.  Because these are not discrete actions under *Morgan* or *O'Connor*, they are not time-barred.

another university.  (*Id.* at ¶¶ 107, 110)  On or about April 27, 2006, Farley notified plaintiff that she was to be placed on administrative leave.  (*Id.* at ¶¶ 109-10)  On May 8, upon returning from back-to-back track meets out of state, Bell fired plaintiff without giving her any written notice of non-renewal of contract or any formal termination letter. (*Id.* at ¶¶ 112-16)

On May 10, 2006 Bell instructed plaintiff that she was no longer authorized to represent defendant at any meeting or function after May 14, 2006.  (*Id.* at ¶ 120) Plaintiff was no longer permitted to coach the women's track team for the remaining 2006 season, and was prohibited from attending the MEAC spring and summer meetings and the NCAA regional qualifying tournament.  (*Id.* at ¶¶ 125, 127) Additionally, sometime prior to the last Leadership Institute meeting in June, defendant contacted the Leadership Institute to explain that plaintiff was no longer an employee and could not represent defendant at the Leadership Institute.  (*Id.* at ¶ 128)  Plaintiff claims that these actions were retaliatory.  (D.I. 22 at 16)  Because these acts occurred after the March 26, 2006 time bar, it is not necessary to determine whether they are discrete.

### b.  Plaintiff's contract and termination of employment

Defendant contends that the court should dismiss and strike any claims about plaintiff's contract (asserted in count I, sex discrimination and count III, retaliation) because the decision not to renew was made prior to March 23, 2006.  (D.I. 19 at 20) Plaintiff concedes that the nonrenewal is a discrete act but asserts that dismissal would be inappropriate because a cause of action regarding contract status only accrues once

27

the employer's decision is definitive and the employer has explicitly communicated that decision to the employee. (D.I. 22 at 31)

Plaintiff's citations to other cases involving defendant on similar issues are persuasive. The Supreme Court has held that the statute of limitations begins to run when an employment decision is made and the employee has been notified. *See Del. State Coll. v. Ricks*, 449 U.S. 250, 259 (1980). In determining what is a definitive communication, this court has found that "seesaw representations" to plaintiff about his employment are not definitive statements regarding the plaintiff's employment status even where a provision in plaintiff's contract stated that it would terminate after one year. *See Ohemeng v. Del. State Coll.*, 643 F. Supp. 1575, 1577, 1580 (D. Del. 1986). In *Ohemeng*, plaintiff had received a letter containing a provision that his contract for the 1983-84 school year was terminal after one year–in other words, that it would not be renewed. *See id.* at 1577. Ohemeng, upon becoming aware of the termination provision, met with his department chair, who assured him he would not be terminated. *See id.* Additionally, towards the end of the school year, Ohemeng was assigned to teach four classes in the following school year. *See id.* The court found that, although Ohemeng had entered a terminal contract, it was reasonable for him to infer based on defendant's representations that the university was offering him continued employment. *See id.* at 1579-80. More recently, this court found that, where a plaintiff received notice that she would receive a terminal contract for the 1994-95 school year, but was later told by the president of the university that he was not aware that her contract was terminal and that she would receive 90-day notice before termination, a decision had not been

definitively made and explicitly communicated to her. *See Lamb-Bowman v. Del. State Univ.*, Civ. No. 98-658, 1999 WL 1250889, at *1-2, *8 (D. Del. Dec. 10, 1999). The *Lamb-Bowman* court relied heavily upon the fact that the university had indicated to plaintiff that if she improved in certain areas, reconsideration of the terminal provision would be possible, but also noted that the president's representations that plaintiff would receive 90-day notice could cause plaintiff to reasonably believe the university had modified her contract. *See id.* at *1, *6, *8.

Plaintiff in the case at bar alleges to have experienced similar "seesaw representations" as those made in *Ohemeng* and *Lamb-Bowman*. Plaintiff asserts that her superiors viewed her favorably, and that she believed that she would receive a long-term contract in spring of 2005. (D.I. 16 at ¶¶ 13-17, 19) Plaintiff also points out that she never received the required 30-day written notice of nonrenewal of contract. (*Id.* at ¶¶ 21, 116) When plaintiff asked administration and human resources about her contract, she was given conflicting responses. (*Id.* at ¶¶ 24, 44) Further, plaintiff was promoted in July 2005 and told that she would become a full time administrator after the end of the 2005-06 school year, suggesting that defendant intended to keep plaintiff in its employ. (*Id.* at ¶ 31) These allegations are similar to the situation in *Ohemeng*, in which plaintiff had excellent performance reviews, and was assigned to teach for the following school year despite representations that his contract was terminal. *See Ohemeng*, 643 F. Supp. at 1577.

Although plaintiff eventually stopped asking about her contract, she asserts that this decision was not based on having received a definitive answer about the issue, but

because she feared for her job. (D.I. 16 at ¶ 45) Assessing the facts in the light most favorable to the plaintiff, it appears that, as in *Ohemeng* and *Lamb-Bowman*, defendant did not definitively and explicitly communicate to plaintiff that she would not receive a contract. The first time plaintiff was made aware of any definitive stance on her employment was upon termination on May 8, 2006. (*Id.* at ¶ 116) Therefore, plaintiff's claim regarding the nonissuance of a contract is not time-barred.

Despite the fact that termination is a discrete act subject to the statute of limitations, because plaintiff's firing occurred after March 23, 2006, it occurred well within the 300-day look back period and, therefore, is not time-barred. *See Morgan*, 536 U.S. at 114.

## V. CONCLUSION

In sum, the court finds that the DDOL questionnaire does not constitute a charge, and the applicable date for the statute of limitations is March 23, 2006. However, the court also finds that many of plaintiff's claims are not time-barred. Time-barred claims include allegations of wrongful accusation prior to March 23, 2006. These claims are dismissed; however, per *Morgan*, plaintiff may still put on evidence of these accusations to provide background supporting her remaining claims. *See Morgan*, 536 U.S. at 113. Further, because defendant made no explicit communication to plaintiff regarding the status of her contract before March 23, 2006, this claim is not time-barred. All other claims following March 23, 2006 may proceed. Lastly, because plaintiff alleged parts of her hostile work environment claim that occurred after March 23, 2006, plaintiff's hostile work environment claim may proceed.

For the aforementioned reasons, defendant's motion to dismiss is granted in part and denied in part.  An appropriate order shall issue.